## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SASHAY ALLEN-BROWN,

*Plaintiff*,

v.                                                    Civil Action No. 13-1341 (RDM)

DISTRICT OF COLUMBIA,

*Defendant.*

## MEMORANDUM OPINION AND ORDER

Sashay Allen-Brown is a police officer with the District of Columbia's Metropolitan

Police Department. Allen-Brown was lactating when she returned from maternity leave in 2011

and, accordingly, needed to express breast milk during work hours. Upon her return, she sought

a temporary assignment that would not require her to go on beat patrol because an officer on

patrol duty must wear a bullet-proof vest that can interfere with lactation by causing pain and

clogged milk ducts. Allen-Brown also complained to her supervisors that the designated location

for expressing milk at the police station was unclean. She alleges that the District of Columbia

discriminated and retaliated against her in violation of the Pregnancy Discrimination Act and

Title VII of the Civil Rights Act of 1964, as well as the D.C. Human Rights Act, when it placed

her on patrol duty and denied her request for a limited-duty accommodation shortly after she

complained about the lactation facility. She also alleges that the District violated the D.C.

Human Rights Act's requirement that employers take affirmative steps to accommodate lactating

women.

The case is presently before the Court on the parties' cross-motions for summary

judgment. The District of Columbia moves for summary judgment as to the discrimination and

retaliation claims. Dkt. 26. Allen-Brown cross-moves for summary judgment as to her D.C.-law accommodation claim. Dkt. 28. For the reasons explained below, the Court **DENIES** both motions.

## I.  BACKGROUND

Sashay Allen-Brown began working for the D.C. Metropolitan Police Department ("MPD") as a patrol officer in December 2006. Compl. ¶¶ 6–7. On March 7, 2011, she gave birth to a son. Dkt. 27-9 at 3 (Pl.'s Dep. 27). When Allen-Brown returned to duty after her maternity leave, she was still breastfeeding and thus needed to express milk at work two or three times a day. Dkt. 27-1 at 2; Dkt. 27-3 at 2–3 (Pl.'s Statement of Facts ¶¶ 6, 12); Dkt. 27-8 at 3 (Pl.'s Dep. 19). It is undisputed that Allen-Brown was initially placed on limited-duty status upon her return to work. Dkt. 27-1 at 2. According to the District of Columbia, this was in accordance with its policy that a new mother is automatically granted limited duty for six weeks following her resumption of work. Dkt. 26-1 at 3; Dkt. 26-2 at 1–2 (Def.'s Statement of Undisputed Facts ¶¶ 3, 14); Dkt. 26-4 at 1 (policy statement).

When Allen-Brown first returned to work, she resumed a prior detail to the ID & Records Office. Dkt. 27-9 at 3 (Pl.'s Dep. 27); Dkt. 27-8 at 3 (Pl.'s Dep. 19); Dkt. 28-4 at 3. At that assignment, Allen-Brown was able to use a lactation room to express milk without any issues. Dkt. 27-1 at 2. After a short period of time, however, Allen-Brown requested that she be returned to "full duty status" in the Second District. Dkt. 28-12 at 3–4 (Pl.'s Dep. 20–21). She hoped to be assigned to the night shift; her husband worked during the day, and she wanted to avoid the need for outside help with childcare by working nights. *Id.*; Dkt. 27-13 (Pl.'s Dep. 24); Dkt. 28-12 at 9 (Pl.'s Dep. 43).

Allen-Brown's request to return to the Second District was granted, and she was sent to the Police Academy for one to two weeks of "in-service training" and gun-range practice in preparation for her return to full-duty status. Dkt. 27-1 at 2; Dkt. 28-12 at 3–4 (Pl.'s Dep. 20–21). At the Academy, Allen-Brown used a designated lactation room to express milk once or twice per day. Dkt. 28-12 at 5–6 (Pl.'s Dep. 22–23). The designated room was a conference room with a clear window in each of the two doors to the room. *Id.* One window had paper attached to it in an effort to cover it up, while the other window was in a door to a sergeant's office. *Id.* The sergeant's door had a coat rack in front of it in an attempt to block the window; no paper was used. *Id.* at 6 (Pl.'s Dep. 23). Allen-Brown was uncomfortable with the set-up because one could still see through both of the windows. *Id.* She mentioned the situation to the sergeant, who responded that "she would make sure no one would come in while [Allen-Brown] was lactating." *Id.*

Allen-Brown reported for duty in the Second District on May 2, 2011. Dkt. 27-10 at 4 (Pl.'s Dep. 25). She was assigned to the "midnight" shift, as she had hoped; she reported for roll call around 9:50 p.m. and got off work around 6 or 7 a.m. *Id.* For the next several weeks, every evening at roll call Allen-Brown was assigned to "station duty." Dkt. 27-20 at 3 (Pl.'s Dep. 32). Station duty is also known as "inside duty" and does not require the officer to wear a bullet-proof vest. Dkt. 1-8 at 9 (MPD General Order 110.11); Dkt. 27-1 at 2; Dkt. 27-13 at 3 (Pl.'s Dep. 24). By contrast, under the District's uniform policy, absent a medical waiver, officers with a patrol-duty assignment outside of the station must wear a bullet-proof vest, which the MPD General Order on Uniforms and Equipment refers to as "soft-body armor." Dkt. 1-8 at 9 (MPD General Order 110.11).

3

At the time she returned to the Second District, Allen-Brown was still breastfeeding her infant, then about two months old, and thus continued to need to express milk at work. Dkt. 27-1 at 2. At the Second District, the designated lactation room was a lounge area inside the women's restroom; a sign that said "lactating" was simply placed on the women's restroom door. Dkt. 28-12 at 7 (Pl.'s Dep. 29). Allen-Brown was concerned about the location and cleanliness of the lounge because "everyone used it. Officers went there to take rest breaks or take naps . . . during their break[s] . . . . [P]eople do [their] hair there, . . . it was an all-purpose room basically." *Id.* at 7–8 (Pl.'s Dep. 29–30).[1] Allen-Brown made several oral complaints about the facilities to "various officials," including Lieutenant Alesia Wheeler-Moore. *Id.*; *see also* Dkt. 27-19 at 5 (Pl.'s Dep. 68). When nothing was done in response, she decided to put her complaint in writing. Dkt. 28-12 at 8 (Pl.'s Dep. 30). On June 9, 2011, Allen-Brown emailed Lieutenant Wheeler-Moore and asked whom to contact about the cleanliness of the lactation room. Dkt. 1-7 at 2. She stated that "[t]he floor needs to be swept and mopped" and that "[o]n several occasion[s][,] . . . there was hair all over the table and floor." *Id.* She did not receive a response until June 22, 2011. *Id.*; Dkt. 27-18 at 4 (Pl.'s Dep. 68).

Meanwhile, on June 12, 2011, Allen-Brown wrote to the Commander of the Second District through her chain of command (an unidentified lieutenant and a captain) and requested to be "detailed to the station." Dkt. 1-9 at 2. Although it is unclear from the record what precipitated this request, it appears that Allen-Brown sought to clarify that she would be assigned to inside duty at the station until her son, then fourteen weeks old, was one year old. She

---

[1] As one court has explained, "[u]se of a breast pump requires a private location because all such pumps require a woman to expose her breasts in order to position the equipment properly during the pumping process. It is not recommended that a restroom be used for expressing milk due to the risk of infection." *Currier v. Nat'l Bd. of Med. Examiners*, 965 N.E.2d 829, 836 (Mass. 2012).

explained that she was "breast[]feeding and lactating" and that she was "unable to wear [her] vest" because it was "extremely painful and could clog [her] ducts and slow down the production of [her] milk supply." *Id*. She further explained that she planned to breastfeed her son until he was one year old. *Id*. Allen-Brown's decision to breastfeed for the first year of her son's life was consistent with the District's "Lactating Accommodation Policy," promulgated in January 2011, which stated, among other things, that "[i]t is the policy of the MPD to provide reasonable break time during work hours for a member to express breast milk for her nursing child for one (1) year after the child's birth." Dkt. 28-7 at 2. The Commander for the Second District denied Allen-Brown's request for an accommodation. Dkt. 1-9 at 2. Although the record does not reflect when the Commander made this decision, the Captain for the Second District apparently forwarded Allen-Brown's request to the Commander on June 15, 2011. *Id*. In any event, Allen-Brown continued to be assigned to station duty on an ad hoc basis until June 23. Dkt. 27-20 at 3 (Pl.'s Dep. 32).

On June 22, 2011, Wheeler-Moore forwarded Allen-Brown's email about the cleanliness of the designated lactation area to Sergeant Wanda Fisher, and Fisher responded to Allen-Brown that same morning. Dkt. 1-7 at 2. Fisher stated that Allen-Brown needed to comply with the "process" for using the lactation room, including "advis[ing] [her] of the dates and time[s] that [Allen-Brown] ha[d] previously used the lactating room" and "sign[ing] in and out on the Lactation Request Form and Book" in the future. *Id*. According to Fisher, this would "provide[] [Allen-Brown] the opportunity to have privacy while utilizing this room and give [Fisher] an idea of how many times it is being used and how often it should be cleaned." *Id*. She also stated that "[t]he cleanliness of the room will be taken care of immediately" and that Allen-Brown should "also feel free to let [her] know about issues of cleanliness" as they arose. *Id*. According

to Allen-Brown, however, nothing about the condition of the room changed after Fisher responded to the email. Dkt. 27-19 at 5 (Pl.'s Dep. 68).

Through June 22, "every sergeant that conducted roll call [at the Second District] [had] placed [Allen-Brown] in the station because [she] was lactating." Dkt. 27-20 at 3 (Pl.'s Dep. 32). But when Allen-Brown reported for roll call for the June 22–23 night shift—her first shift following Fisher's reply to her email—the sergeant on duty, Sergeant Phillips, assigned her to patrol duty. *Id.* Allen-Brown responded that she worked inside the station and could not go outside on patrol because she was lactating and could not wear her vest. *Id.* Sergeant Phillips said "[o]kay" and ordered her to report to the Police and Fire Clinic. *Id.*

The next morning, on June 23, 2011, Allen-Brown reported to the clinic and was examined by the doctor on duty, Dr. Rangamani Murthy. *Id.*; Dkt. 28-15 at 4; Dkt. 27-21 at 4 (Pl.'s Dep. 69). Dr. Murthy completed a "Limited Duty Certification Form" on which she stated that Allen-Brown could work full-time but listed the following physical restrictions: "[l]ifting – no greater than: 1–10 lbs;" "no outside patrol;" "chest, unable to wear the vest at all;" and "officer cannot wear the protective vest." Dkt. 28-15 at 2–3. During the clinic visit, Allen-Brown received and signed a "Limited Duty Program Information Sheet." Dkt. 28-12 at 10; Dkt. 27-21 at 5 (Pl.'s Dep. 70). That sheet listed her limited-duty assignment as "2D" and, among other things, notified her of her obligation to report to her limited-duty assignment for work. *Id.* The information sheet made no mention of any further procedures required to obtain approval for a limited-duty status, *id.*, although Allen-Brown was separately instructed to get a note from her personal doctor, which she obtained on June 29 and provided to the Police and Fire Clinic at her two-week follow-up appointment. Dkt. 27-23 at 3–4.

The day after Allen-Brown's clinic visit, June 24, 2011, William B. Sarvis, Jr., the Director of the Medical Services Branch of MPD, sent a memorandum to her acknowledging that "[f]ollowing an examination by a Clinic Physician, a determination was made to change your *Medical Duty Status* from 'full duty' to 'limited duty'" because of "a condition not related to the performance of your duties as a police officer." Dkt. 1-11 at 2. Sarvis stated, however, that "[n]otwithstanding your failure to complete the *Request for Authorization to Participate in the Limited Duty Program*, I have reviewed your case and determined that you will not receive authorization to participate in the limited duty work program." *Id*. The memorandum provided that "[e]ffective June 25, 2011," Allen-Brown would "be placed in a chargeable sick status" until such time as "the physicians at the Police & Fire Clinic determine that [she] may work in a full duty capacity." *Id*. Sarvis explained that if Allen-Brown lacked sufficient leave to cover her absence, she would be placed on unpaid leave. *Id*. When Allen-Brown reported for duty that night, Antonio Charland delivered the Sarvis memorandum to her. *Id*. Charland had been copied on Fisher's email to Allen-Brown about the conditions of the lactation room. Dkt. 1-7 at 2.

In a declaration submitted in this litigation, Sarvis explained that as Director of the Medical Services Branch, he is "responsible for recommending to the Chief of Police" whether an officer unable to perform the full range of police duties is capable of performing in a limited-duty status.[2] Dkt. 26-5 at 1 (Sarvis Decl. ¶ 3). He stated that under District policy, he is authorized to grant limited-duty status for 30 calendar days for a condition stemming from off-the-job injuries—a condition described as Non Performance of Duty ("Non POD") injury—"*if*

---

[2]   In her opposition to the District's motion for summary judgment, Allen-Brown asserts that Sarvis has no medical training, but she does not supply any supporting evidence for that assertion. Dkt. 27-1 at 9.

*such a member requests [his] permission* to join the Limited Duty Work Program by completing a Non POD Limited Duty Request Form and provides the requisite supporting documentation from a healthcare provider." *Id.* at 2 (Sarvis Decl. ¶ 5) (emphasis added). Although under this policy women are automatically granted limited duty if they gave birth in the previous six weeks, Sarvis states that they "must follow the same procedure for requests for extensions of their participation in the Non POD Limited Duty Program as other MPD members." *Id.* (Sarvis Decl. ¶ 9). Under that procedure, "at least 10 days prior to" the expiration of an initial 30-day grant of limited duty, "a MPD member may submit to [Sarvis] another Non POD Limited Duty Request Form, including the requisite supporting documentation." *Id.* (Sarvis Decl. ¶ 7). Sarvis would then forward the request for an extension to the Chief of Police "or [her] designee" along with his recommendation for a final determination. *Id.* (Sarvis Decl. ¶ 8).

Allen-Brown disputes whether officers were ever made aware of the policy on which Sarvis's declaration relies, Dkt. 27-3 at 2 (Pl.'s Statement of Facts ¶¶ 2–4), and, indeed, the District concedes that "[i]t is uncertain when a member of the MPD would be given notice of this purported separate application requirement for limited duty status." Dkt. 29-1 at 2 (Def.'s Statement of Disputed Facts ¶ 3). The policy outlined by Sarvis, moreover, differs from the procedure for obtaining a limited-duty assignment set forth in an MPD General Order that became effective on April 25, 2006.[3] *See* Dkt. 27-4. Under that General Order, limited-duty

---

[3] The policy relied upon in Sarvis's declaration is included in the record as an undated memo from "Director[,] Medical Services Branch" to "MPD Member," and requires that an officer "who has sustained a NON POD injury or illness and wishes to participate in the limited duty program must first request permission from the Director of the [Medical Services Branch] by completing the accompanying forms with any/all supporting documentation from the member['s] private healthcare provider." Dkt. 26-4 at 1. Sarvis's declaration states that, as one of his duties, he "provide[s] instructions on how to participate in the Non POD Limited Duty Work Program to MPD members along with contact information for those who had any questions." Dkt. 26-5 at 2 (Sarvis Decl. ¶ 4). At Sarvis's deposition, he was asked how officers were informed of the

status is defined as a "[t]emporary status for members who are not able to perform the full range of police duties because of injury/illness or other temporary medical disability, but are certified by the Chief Physician as being capable of effectively performing certain types of work." *Id.* at 4. According to this policy, an officer who sustains an off-duty injury or illness shall "[n]otify an official of his/her organizational element, as soon as he/she is capable," and shall "report to the Clinic for a medical evaluation." *Id* at 8. The policy further provides that:

> If [an officer] is unable to perform the full range of police duties, the Clinic may place the member in a limited duty status, *regardless of whether the employee requested the change.* . . . The Chief Physician shall prepare a . . . Certification for Limited Duty . . . . *Limited duty status begins when the Chief Physician certifies* on the . . . [f]orm . . . that [an officer] is medically available for a limited duty assignment.

*Id.* at 14 (emphases added). The General Order further provides that upon receipt of the Limited Duty Certification, the officer is to notify the Watch Commander and report for duty. *Id.* Relying on the General Order, Allen-Brown thus disputes Sarvis's contention that she was required to file a separate request for limited duty apart from obtaining a Certification for Limited Duty from the clinic.[4]  Dkt. 27-2 at 6 (Pl.'s Statement of Disputed Facts ¶ 19).

---

policy requiring a separate request for limited-duty status. He stated that he believed that the policy was circulated in 2010, before he worked for the District, and that he "[couldn't] answer" why there was not an accompanying amendment to the General Orders reflecting the procedural change. Dkt. 27-5 at 2 (Sarvis Dep. 35–37). He also stated that he believed that an officer would be served with the policy at the time that the clinic notified the officer that he or she could not work in a full-duty status, *id.* (Sarvis Dep. 37), and that this would been done by "the doctors I'm pretty sure," Dkt. 27-6 at 2 (Sarvis Dep. 44).

[4]  Allen-Brown also contends that the policy discussed in Sarvis's declaration must be disregarded because it was first produced in discovery on June 9, 2015 "long after discovery was closed." Dkt. 27-3 at 1 (Pl.'s Statement of Facts ¶ 1). But, in fact, the discovery deadline was extended to June 9, 2015. May 26, 2015 Minute Order.
    The parties do not address the applicability, if any, of the MPD's separate policy providing that "[f]emale police officers experiencing difficulty wearing the soft-body armor, *due to pregnancy,* shall request a medical certificate, recommending placement on limited duty, from

Although Sarvis's June 24, 2011 memorandum provided that he was denying Allen-Brown limited-duty authorization "notwithstanding [her] failure to complete the *Request for Authorization*," Dkt. 1-11 at 2, in his declaration, Sarvis states that he denied Allen-Brown "authorization to participate in the Non POD limited duty program because she had never applied for it," Dkt. 26-5 at 3 (Sarvis Decl. ¶ 18).  According to Sarvis, "[t]o [his] knowledge, Officer Allen-Brown never made a request for an extension" and had "already worked in a limited duty capacity for six weeks"—the period of automatic limited duty for a new mother under the purportedly applicable policy.  *Id.* (Sarvis Decl. ¶¶ 15–17).

Sarvis further declared that he "learned from the Police and Fire Clinic that Officer Allen-Brown was unable to complete the full range of duties . . . [for] her position," *id.* (Sarvis Decl. ¶ 16), and that "[a]t the time [he] made [his] decision, [he] did not know that Officer Allen-Brown had complained about the condition of the lactation room at the Second District," *id.* (Sarvis Decl. ¶ 19).  In an earlier deposition, however, Sarvis stated that he "really [didn't] know" how the issue of Allen-Brown's authorization for limited duty "made it to [his] desk" after her visit to the clinic, and that he assumed that his lieutenant, who "tracked the information on pregnant females," brought it to his attention.  Dkt. 27-6 at 2 (Sarvis Dep. 45).  Finally, Sarvis's declaration stated that of 148 final determinations regarding extensions of Non POD limited duty made during 2011, 137 extensions were denied (93%).  Dkt. 26-5 at 3 (Sarvis Decl. ¶ 13).  Of those, 77 were denied "on the basis that the MPD member did not make a request for an extension."  *Id.* (Sarvis Decl. ¶¶ 13 –14).

---

their private doctor. The Director, Medical Services Division, shall place the member in a limited duty status." Dkt. 1-8 at 10 (emphasis added).

In accordance with Sarvis's memorandum denying Allen-Brown limited-duty authorization, Allen-Brown's leave began on June 25, 2011. Dkt. 1-11 at 2. After her annual leave ran out, she remained on unpaid leave for about eight months. Dkt. 27-22 at 4 (Pl.'s Dep. 36); Dkt. 28-12 at 9 (Pl.'s Dep. 43). Allen-Brown returned to work on full-duty status on April 17, 2012, after she finished breastfeeding. Dkt. 1-6 at 3. In the interim period, the Fraternal Order of Police pursued a grievance on her behalf, which was denied. Dkt. 1-4; Compl. ¶ 23. Allen-Brown also filed a charge with the Equal Employment Opportunity Commission ("EEOC"), which issued a right-to-sue letter on June 10, 2013. Dkt. 1-5.

On September 5, 2013, Allen-Brown filed this action against the District and the MPD, seeking damages, attorney's fees and costs, and equitable relief for gender and pregnancy discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. (Count I), retaliation in violation of Title VII (Count II) and the First Amendment (Count III), discrimination based on gender and family responsibilities in violation of D.C. Code § 2-1401.01 *et seq*. (Count IV), failure to provide accommodations for breastfeeding mothers and retaliation in violation of D.C. Code § 2-1402.82 (Count V), and violations of 42 U.S.C. §§ 1981 and 1983 (Count VI). *See* Compl. ¶¶ 32–78. On July 7, 2014, Judge Amy Berman Jackson dismissed MPD as a defendant and also dismissed Allen-Brown's claims against the District under the First Amendment and §§ 1981 and 1983. *See Allen-Brown v. District of Columbia*, 54 F. Supp. 3d 35, 37 (D.D.C. 2014).

On November 20, 2014, the case was randomly reassigned. Nov. 20, 2014 Minute Order. On June 12, 2015, the only remaining defendant, the District, filed a motion for summary judgment as to the discrimination and retaliation claims. Dkt. 26. On June 29, 2014, Allen-

Brown filed a cross-motion for partial summary judgment as to the D.C.-law accommodation claim. Dkt. 28.

## II. ANALYSIS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Liberty Lobby*, 477 U.S. at 248). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255. Moreover, "summary judgment must be approached with special caution in discrimination cases." *Stewart v. White*, 61 F. Supp. 3d 118, 128 (D.D.C. 2014) (internal quotation marks omitted). That being said, the nonmoving party "is not relieved of [the] obligation to support [his or her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted) (first alteration in original).

As a threshold matter, the Court rejects the District's contention that the Court should treat the District's Statement of Undisputed Facts as conceded because Allen-Brown failed to comply with the requirements of Local Rule 7(h).[5] *See* Dkt. 29 at 2–3. The District asserts that

---

[5]   As relevant here, Local Rule 7(h) requires that "[a]n opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as

Allen-Brown violated this rule because in identifying her disagreements with the District's version of the facts, she submitted a Statement of Disputed Facts that incorporates by reference parts of her simultaneously submitted Statement of Facts, instead of citing directly to the record in the Statement of Disputed Facts. *See* Dkt. 27-2 (Pl.'s Statement of Disputed Facts); Dkt. 27-3 (Pl.'s Statement of Facts). Here, however, this deviation from the rule is relatively minor and does not justify the harsh remedy that the District seeks. Both of Allen-Brown's statements are relatively short, the Statement of Disputed Facts cites to specific paragraphs of the Statement of Facts, and the Statement of Facts in turn includes citations to the relevant portions of the record. Contrary to the District's assertion, Allen-Brown's objections to the District's Statement of Undisputed Facts are readily ascertainable, even if the need to cross-reference the documents is slightly cumbersome.

The Court, accordingly, denies the District's request to treat its Statement of Material Facts as conceded and turns to the merits of the parties' cross-motions for summary judgment.

## A.     Discrimination Claims

In Count I, Allen-Brown alleges discrimination based on gender and pregnancy in violation of Title VII, and in Count IV, she alleges discrimination based on gender and family responsibilities in violation of the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq*. Both counts are premised on Allen-Brown's allegation that the MPD made accommodations for other officers that "it was unwilling to make for [Allen-Brown], who had a medical condition (lactation) related to pregnancy and childbirth." Dkt. 27-1 at 5; Compl. ¶¶ 41, 61. The District moves for summary judgment as to both counts. Dkt. 26-1 at 6.

---

to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." D.D.C. Civ. R. 7(h)(1).

Under Title VII of the Civil Rights Act of 1964, a covered employer may not "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).[6] In 1978, Congress enacted the Pregnancy Discrimination Act ("PDA") in response to the Supreme Court's holding in *General Electric Co. v. Gilbert*, 429 U.S. 125, 145–46 (1976), that an employer's exclusion of pregnancy-related disabilities from a benefit plan did not constitute discrimination on the basis of sex. *See* Pub. L. No. 95-555, 92 Stat. 2076 (1978).[7]

The PDA added two clauses to Title VII: The first specifies that "[t]he terms 'because of sex' or 'on the basis of sex' [in Title VII] include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k)(2). The second provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to

---

[6] "Title VII places the same restrictions on . . . District of Columbia agencies as it does on private employers." *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005) (internal quotation marks omitted).

[7] In 2010, the Patient Protection and Affordable Care Act amended the Fair Labor Standards Act ("FLSA") to require covered employers to provide:

> (A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and

> (B) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

Pub. L. No. 111-148, § 4207, 124 Stat. 119, 577 (2010) (codified at 29 U.S.C. § 207(r)). Allen-Brown has not alleged a FLSA claim.

14

work." *Id.* The DCHRA contains parallel language, *see* D.C. Code § 2-1401.05, and courts apply the same standards to it as to Title VII and PDA claims, *see, e.g.*, *Wilkerson v. Wackenhut Protective Servs., Inc.*, 813 F. Supp. 2d 61, 65–66 (D.D.C. 2011). The Court, accordingly, treats the two discrimination claims together in the remainder of this section, as the parties did in their briefs. *See* Dkt. 26-1 at 6; Dkt 27-1 at 5.

The Supreme Court recently clarified the standard for disparate-treatment claims under the PDA in *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338 (2015). In that case, the plaintiff claimed that the United Parcel Service ("UPS") violated Title VII and the PDA "in refusing to accommodate her pregnancy-related lifting restriction." *Id.* at 1344. The evidence showed that "UPS had a light-duty-for-injury policy with respect to numerous other persons, but not with respect to pregnant workers," *id.* at 1347, and that it "accommodated several individuals when they suffered disabilities that created work restrictions similar to [the plaintiff's]," but not all injured workers, *id.* Unsurprisingly, the plaintiff and UPS drew dramatically different conclusions from this evidence. The plaintiff read the second clause of the PDA literally, so that all that she needed to show was that UPS accommodated "one or two workers" who were similarly situated in their ability or inability to work, regardless of their specific circumstances. *Id.* at 1349. UPS, in contrast, argued that the second clause merely clarified the first clause defining sex discrimination to include pregnancy discrimination and that a PDA plaintiff asserting discrimination in accommodations would need to show that her employer had discriminated against pregnant women "*within* a facially neutral category (such as those with off-the-job injuries)." *Id.* (emphasis in original).

The Supreme Court declined to adopt either position. It concluded that the plaintiff's interpretation "prove[d] too much," essentially adopting a "most-favored-nation" standard for

pregnancy accommodations. *Id.* Thus, under the plaintiff's reading of the statute, if an employer chose to accommodate a small group of employees engaged in "particularly hazardous jobs, or those whose workplace presence is particularly needed, or those who have worked for the company for many years," it would also need to accommodate pregnant employees with the same "ability or inability to work." *Id.* at 1349–50. But the Court also concluded that UPS's construction of the statute was untenable, since it treated the second clause of the PDA as surplusage and failed to give effect to Congress's intent to "overturn *Gilbert* in full." *Id.* at 1353. As the Court explained, "'the first clause of the [PDA] reflects Congress's disapproval of the reasoning in *Gilbert*,'" while "the second clause . . . 'was intended to overrule the holding in *Gilbert* and to illustrate how discrimination against pregnancy is to be remedied.'" *Id.* at 1353 (quoting *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 284–85 (1987)).

Having rejected both positions, the Court adopted a middle ground. It held that in a case alleging a discriminatory failure to accommodate under the PDA, the initial steps of the *McDonnell Douglas* framework apply as usual. Thus, in the absence of direct evidence of discrimination, a plaintiff may make out a *prima facie* case of discrimination by showing that "she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in the ability or inability to work.'" *Id.* at 1354. The burden then shifts to the employer to come forward with a "'legitimate, nondiscriminatory' reason[] for denying her accommodation." *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 422 U.S. 792, 802 (1973)). Under the PDA, that justification, however, "cannot consist simply of a claim that it is more expensive or less convenient to add pregnant woman to the category of those . . . whom the employer accommodates." *Id.* If the employer proffers such a legitimate, non-discriminatory reason, the

burden then shifts back to the plaintiff to show that the employer's asserted justification was, in fact, pretextual. *Id.*

It is at this point in the analysis that the second clause of the PDA is given effect. In the normal course of a Title VII case, and under the approach advocated by Justice Alito in his separate opinion, *see id.* at 1356 (Alito, J., concurring in the judgment), a plaintiff can raise a genuine issue of material fact about whether the asserted rationale was pretextual by, for example, showing that the employer's justification was not plausible, that it was contradicted by other evidence, or that the employer offered shifting rationales, *see, e.g.*, *Geleta v. Gray*, 645 F.3d 408, 413–15 (D.C. Cir. 2011); *George*, 407 F.3d at 413–15. To this, the *Young* majority added the possibility that a PDA plaintiff "may reach a jury on [the issue of pretext] by providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden." *Young*, 135 S. Ct. at 1354. One way that a plaintiff might make this showing is by producing "evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." *Id.*

Applying this framework, the Court need not be detained with the initial question whether Allen-Brown has established a *prima facie* case of discrimination. The District has conceded, at least for present purposes, that the denial of a limited-duty accommodation qualifies as an adverse employment action. Dkt. 26-1 at 6; *see also Young*, 135 S. Ct. at 1354. It focuses instead on whether that adverse action was taken on the basis of Allen-Brown's gender or the fact that she was lactating. According to the District, it did not. It contends that Sarvis declined to accommodate Allen-Brown because "she . . . never applied for" limited-duty status. Dkt. 26-5 at 3 (Sarvis Decl. ¶ 18). In support of this argument, the District points to statistics indicating

that the MPD declined to extend limited-duty status 93% of the time, and, in more than half of those cases, it did so for the same reason that it claims it declined to grant limited-duty status to Allen-Brown—because the officer did not request an extension. *Id.* (Sarvis Decl. ¶¶ 13–14). Thus, although the District does not use this terminology, its defense is that it had a legitimate, non-discriminatory reason for its action. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) ("[B]y the time the district court considers an employer's motion for summary judgment . . . , the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision—*for example, through a declaration . . .* from the employer's decisionmaker." (emphasis added)).

In considering a summary judgment motion where the defendant has offered a legitimate, non-discriminatory reason for the adverse employment action, a court must "skip ahead to the third step" in the *McDonnell Douglas* framework. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016). As a result, "the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Brady*, 520 F.3d at 493 (quotation marks and alterations omitted). "[T]he district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* at 494 (emphasis in original). Rather, the controlling question becomes whether the plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against [her] on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). This approach does not pretermit consideration of evidence relevant to the plaintiff's *prima facie* case, but rather requires consideration of "*all* the evidence," including evidence about similarly situated comparators, the

veracity of the employer's proffered justification, and pretext. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)) (emphasis added).

As a result, the only relevant inquiry is whether Allen-Brown has produced sufficient evidence for a reasonable jury to find that the MPD, in fact, discriminated against her based on her gender or her pregnancy-related condition. But, unlike in the typical Title VII case, she can carry that burden in one of two ways. She can produce "traditional" evidence that the reason given by the MPD was a pretext for discrimination—that is, evidence that the MPD is "making up or lying about the underlying facts," *Brady*, 520 F.3d at 495, that its proffered reasons "have changed over time," *Geleta*, 645 F.3d at 413, or the like. Or, following *Young*, she could produce "evidence that [the MPD's] policies impose a significant burden on pregnant workers, and that [its] 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden . . . —give rise to an inference of intentional discrimination." *Young*, 135 S. Ct. at 1354. As explained below, the Court concludes that Allen-Brown has produced "traditional" evidence sufficient to raise disputed questions of material fact as to whether the MPD's proffered reason for denying her request for limited-duty status was pretextual.

First, Sarvis's June 12, 2015 declaration asserts that he denied Allen-Brown limited-duty status because she failed to submit a Non POD Limited Duty Request Form to him. Dkt. 26-5 at 2–3 (Sarvis Decl. ¶¶ 5–9, 18). But, his memorandum to Allen-Brown denying her authorization stated that "[n]otwithstanding your failure to complete *the Request for Authorization to Participate in the Limited Duty Program*, I have reviewed your case and determined that you will not receive authorization to participate in the limited duty work program." Dkt. 1-11 at 2

(emphasis added).  "Notwithstanding"  means "in spite of" or "despite."  *Notwithstanding*,

Webster's Third New International Dictionary,  Unabridged (2016).  Thus, the contemporaneous

evidence of Sarvis's decision to deny Allen-Brown  limited-duty  status arguably contradicts his

subsequent statement—in a litigation  document—that he denied her limited-duty  status because

of her failure to complete the required paperwork. [8]  It is possible,  of course,  that Sarvis  did not

mean that he was disregarding  Allen-Brown's  failure to complete the request form,  and instead

meant to convey just the opposite—albeit  inartfully.   In light of the record,  however, the Court

concludes  that Sarvis's intent and credibility  present questions of fact for the jury.

Second, it is disputed  whether the policy  requiring  officers  to submit  this additional

paperwork (a) superseded a seemingly  contradictory  General Order, *compare* Dkt. 27-4 at 14

(General Order) *with* Dkt. 26-4 at 1 (policy requiring  further paperwork), and (b) was ever

promulgated  to Allen-Brown  or other officers.  The District itself concedes that "[i]t is uncertain

when a member of the MPD would be given notice of this purported  separate application

requirement  for limited  duty status."  Dkt. 29-1 at 2 (Def.'s Statement of Disputed Facts ¶ 3).

Whether a valid  policy existed and was made known to Allen-Brown  is material to the question

whether failure to comply  with the policy  was the District's  true reason for denying her limited-

duty status.  Although the ultimate question  is not whether the policy in fact existed or was

known to Allen-Brown,  but rather "whether the [MPD] *honestly and reasonably believed* that

the" policy  existed and was the reason for its denial of limited-duty  status, *see Brady*, 520 F.3d at

496 (emphasis in original),  the disputed  questions of fact surrounding  whether Allen-Brown  was

required  to submit  additional  paperwork to receive a limited-duty  assignment  are material  to the

---

[8]  Moreover, as discussed below,  it is not even clear that the District is correct that Sarvis was
the relevant decision  maker.

latter issue. *Cf. Young*, 135 S. Ct. at 1356 ("[W]hen an employer claims to have made a decision for a reason that does not seem to make sense, a factfinder may infer that the employer's asserted reason for its action is a pretext for unlawful discrimination." (Alito, J., concurring in the judgment) (emphasis omitted)).

Third, the evidence does not indisputably resolve the question *who* made the decision that Allen-Brown should be denied limited-duty status, and, if it was not Sarvis, that fact might raise sufficient doubt about the District's stated reason for denying the request to support an inference of improper motive. Moreover, if Sarvis was not the decision maker, that would leave the question of the motivation of the *actual* decision maker unresolved. Although neither party addresses the matter, it appears that on June 12, 2011, Allen-Brown wrote a memorandum to the Commander of the Second District regarding her need to be assigned to duties inside the station because she was lactating. Dkt. 1-9 at 2. Next to the Commander's name on the memo, someone—presumably, the Commander—wrote "denied." *Id*. The Commander's signature on the memo is not dated, but the memo at least raises the question whether it was the Commander, rather than Sarvis, who made the decision not to accommodate Allen-Brown. That hypothesis, moreover, is further supported by Sarvis's own statement that, under District policy, he was to make a *recommendation* as to limited-duty status and the final determination would be made by "the Chief of Police or [her] designee." Dkt. 26-5 at 2 (Sarvis Decl. ¶ 8). Again, for present purposes the Court need not—and should not—determine who made the decision. What matters is that a reasonable jury might question the District's account of what happened and why.

Much of the District's argument relies on testimony from Sarvis that Allen-Brown was treated like others in similar circumstances, thus bolstering the District's contention that the reason Sarvis gave is not pretextual. *See* Dkt. 26-1 at 6. According to the declaration Sarvis

submitted in support of the District's motion, the MPD made 148 determinations "regarding extensions for [non-performance of duty or "Non-POD"] limited duty." Dkt. 26-5 at 3 (Sarvis Decl. ¶¶ 13–14). Of these, the Department denied extensions of limited-duty status on 137 occasions—or 93% of the time. *Id*. (Sarvis Decl. ¶ 13). And the Department denied 77 of those requests "on the basis that the MPD member did not make a request for an extension." *Id*. (Sarvis Decl. ¶ 14). Thus, according to Sarvis, Allen-Brown received the same treatment that the overwhelming majority of other officers received, and she received that treatment for the same reason that many others did—she failed to make "a request for an extension for Non POD limited duty." *Id*. (Sarvis Decl. ¶ 15).

Although the District's argument appears to channel *Young*, as an initial matter, it is far from clear that the District has identified the correct comparators in making such a claim. In *Young*, for example, UPS's approach—like the approach that the District seems to propose here—would have compared "the accommodations an employer provides to pregnant women with the accommodations it provides to others within a facially neutral category (such as those with off-the-job injuries) to determine whether the employer has violated Title VII." *Young*, 135 S. Ct. at 1349 (emphasis omitted). But the Supreme Court rejected that approach, explaining that it would render the second clause added by the PDA irrelevant. *Id*. at 1352. In any event, Allen-Brown certainly does not need to establish that the MPD accommodated similarly disabled *men*, as the District suggests. *See* Dkt. 26-1 at 6 ("Plaintiff was not treated differently than similarly situated male employees."). That was precisely the line drawn in *Gilbert*, which Congress displaced by adopting the PDA. *See Young*, 135 S. Ct. at 1353 ("In *Gilbert*, . . . the Court held that the plan . . . did not discriminate on the basis of sex because there was no risk from which

men are protected and women are not. . . . The second clause [added to Title VII by the PDA] . . . was intended to overrule the holding in *Gilbert* . . . ." (internal quotations and citations omitted)).

Moreover, to the extent that the District relies on that the fact that the vast majority of MPD officers were denied extensions of their limited-duty status, *see* Dkt. 26-1 at 6, that fact, standing alone, does little to bolster its asserted non-discriminatory rationale for denying Allen-Brown's extension. Although *Young* held that a "plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodated *a large percentage* of nonpregnant workers while failing to accommodate *a large percentage* of pregnant workers," 135 S. Ct. at 1354 (emphases added), it misreads *Young* to assert that a plaintiff is *required* to show such disparities in order to survive summary judgment in a pregnancy discrimination suit. Such evidence may be necessary, or at least helpful, where the plaintiff seeks to show that "the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden," *id.*, but here, Allen-Brown does not make such an argument or rely on statistical disparities to support her claim of pretext.

Instead, Allen-Brown relies on "traditional" evidence to establish a genuine question of material fact about the District's proffered reason for denying her requested accommodation— that is, whether the reason offered by the MPD is the real reason for the denial or simply a pretext for discriminatory intent. In support of this argument, she points to the District's own evidence to show that eleven other MPD officers who sustained injuries or disabilities off the job were, in fact, accommodated, while she was not, Dkt. 27-6 at 2 (Sarvis Decl. ¶¶ 13–14), and to the evidence discussed above (*supra* pp. 19–21) to show that the non-discriminatory reason that the District has proffered for its preferential treatment of these eleven officers is pretextual, *see*

Dkt. 27-1 at 7.   Drawing "all justifiable inferences" in her favor, *Steele*, 535 F.3d at 255, the

Court concludes that "a reasonable jury [could] . . . find that the employer's asserted non-

discriminatory reason was not the actual reason and that the employer intentionally discriminated

against [her] on a prohibited basis," *Adeyemi*, 525 F.3d at 1226.

Resisting this conclusion, the District argued for the first time in its reply brief that

breastfeeding and lactation are not covered by the PDA and Title VII. Dkt. 29 at 3–4.  As an

initial matter, the Court notes that the District's failure to raise this issue until its reply brief

would, standing alone, provide a sufficient basis for the Court to reject the argument.  *See, e.g.*,

*Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008).   But, even giving the District the

benefit of the doubt, the Court concludes that the argument fails on the merits.

In response to the Supreme Court's *Gilbert* decision, 429 U.S. 125, the PDA amended

Title VII to define the phrases "because of sex" and "on the basis of sex" to include actions taken

"because of or on the basis of pregnancy, childbirth, or related medical conditions."   42 U.S.C.

§ 2000e(k)(2).  The question, therefore, is whether "lactation" is a "medical condition[]"

"related" to "childbirth."   *Id.*  As explained below, the Court concludes that it is.

Although the D.C. Circuit has yet to address this question, the Court finds the Fifth

Circuit's analysis in *EEOC v. Houston Funding II, Ltd.*, 717 F.3d 425 (5th Cir. 2013),

persuasive.  As that court explained, although the PDA does not define "medical condition,"

medical dictionaries "broadly construe [this] term[]" to "include[] any physiological condition."

*Id.* at 428–29 & n.4 (citing Joseph Segen, *McGraw-Hill Concise Dictionary of Modern Medicine*

405 (2006); *The American Heritage Medical Dictionary* (2007); *Miller-Keane Encyclopedia &*

*Dictionary of Medicine, Nursing, and Allied Health* (7th ed. 2003); *Mosby's Medical Dictionary*

(8th ed. 2009)).  Lactation, in turn, "is the physiological process of secreting milk from

mammary glands and is directly caused by hormonal changes associated with pregnancy and childbirth. . . . It is undisputed . . . that lactation is a physiological result of being pregnant and bearing a child." *Id.* at 428; *see also id.* at 428 n. 4 ("Lactation is indisputably a condition related to pregnancy."). Thus, as a matter of plain language, the PDA applies to lactation.

Judges in other jurisdictions have similarly concluded that discrimination based on lactation constitutes sex discrimination under the PDA, both prior to and in the wake of *Houston Funding II* and *Young*.[9] For example, in *Hicks v. City of Tuscaloosa*, No. 13-2063, 2015 WL 6123209 (N.D. Ala. Oct. 19, 2015), the court considered a claim remarkably similar to that of Allen-Brown. The plaintiff, a police officer, asserted that she was discriminated against when she returned from maternity leave while still lactating. *Id.* at *19. She alleged that she was denied a desk assignment and was instead assigned to patrol duty, *id.* at *20–21, during which she would not be able to take regular breaks to express milk and would be required to wear a bullet-proof vest that "would interfere with milk production or cause infection," *id.* at *30. The court denied the defendant's motion for summary judgment on this claim, "agree[ing] [with the Fifth Circuit] that lactating is a medical condition related to pregnancy and childbirth, and that

---

[9] *See, e.g.*, *Gonzales v. Marriott Int'l, Inc.*, No. 15-3301, 2015 WL 6821303, at *11 (C.D. Cal. Nov. 4, 2015) (holding plaintiff's claim regarding denial of lactation accommodation survived motion to dismiss pursuant to *Young*); *Frederick v. New Hampshire*, No. 14-403, 2015 WL 5772573, at *6 (D.N.H. Sept. 30, 2015) (stating that lactating mothers can, in certain circumstances, make out a disparate treatment claim under the PDA); *EEOC v. Vamco Sheet Metals, Inc.*, No. 13-6088, 2014 WL 2619812, at *6 (S.D.N.Y. June 5, 2014) (granting motion to intervene because intervenor "may be able to state a claim for disparate treatment under Title VII based on discrimination in connection with her attempts to continue breastfeeding her infant" under *Houston Funding II*); *Falk v. City of Glendale*, No. 12-925, 2012 WL 2390556, at *4 (D. Colo. June 25, 2012) (positing that "if other coworkers were allowed to take breaks to use the restroom while lactating mothers were banned from pumping, discrimination might exist" under the PDA); *Currier*, 965 N.E.2d at 840 (construing Massachusetts Equal Rights Act and public accommodation discrimination statutes to cover lactation because it "is inextricably linked to pregnancy and thus sex linked").

[under the PDA] a lactating employee may not be treated differently in the workplace from other employees with similar abilities to work." *Id.* at *19.

The EEOC has also adopted the position that lactation is protected by the PDA in its enforcement guidance. *See* EEOC Guidance No. 915.003, *Pregnancy and Related Issues* (June 25, 2015), 2015 WL 4162723. As it explains, "[l]actation, the postpartum production of milk, is a physiological process triggered by hormones." *Id.* at *8. "To continue producing an adequate milk supply and to avoid painful complications associated with delays in expressing milk, a nursing mother will typically need to breastfeed or express breast milk using a pump" several times during the workday. *Id.* (internal footnote omitted). Under the PDA and Title VII,

> An employee must have the same freedom to address such lactation-related needs that she and her co-workers would have to address other similarly limiting medical conditions. For example, if an employer allows employees to change their schedules or use sick leave for routine doctor appointments and to address non-incapacitating medical conditions, then it must allow female employees to change their schedules or use sick leave for lactation-related needs under similar circumstances.
>
> Finally, because only women lactate, a practice that singles out lactation or breastfeeding for less favorable treatment affects only women and therefore is facially sex-based. For example, it would violate Title VII for an employer to freely permit employees to use break time for personal reasons except to express breast milk.

*Id.* (internal footnotes omitted). The EEOC's interpretation of the statute supplies "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

The contrary authority cited in the District's reply brief, moreover, is inapposite or unconvincing. *See* Dkt. 29 at 3–4. The Sixth Circuit's decision in *Derungs v. Wal-Mart Stores, Inc.*, is inapposite, as it concerned the "specific provisions and legislative history of the Ohio Public Accommodation statute." 374 F.3d 428, 430 (6th Cir. 2003). And the Fourth Circuit's

statement in *Barrash v. Bowen* that "[u]nder the [PDA] . . . , pregnancy and related conditions must be treated as illnesses only when incapacitating," 846 F.2d 927, 931 (4th Cir. 1988) (per curiam), was subsequently disavowed by the same court as "*dicta* without any citation of authority," *Notter v. Northern Hand Protection*, 89 F.3d 829, at *5 (4th Cir. 1996) (per curiam) (table). As the later Fourth Circuit decision correctly explained, "[t]he text of the [PDA] contains no requirement that 'related medical conditions' be 'incapacitating.'" *Id.*

Other cases cited by the District reason that "breastfeeding" is not covered under the PDA because the statute "only provides protection based on the condition of the mother—not the condition of the child." *Fejes v. Gilpin Ventures, Inc.*, 960 F. Supp. 1487, 1492 (D. Colo. 1997); *see also McNill v. N.Y. City Dep't of Correction*, 950 F. Supp. 564, 571 (S.D.N.Y. 1996) (same); *Wallace v. Pyro Mining Co.*, 789 F. Supp. 867, 870 (W.D. Ky. 1990) ("Neither Title VII[] nor the [PDA] intended to make it illegal for an employer to deny personal leave to a female worker who requests it to accommodate child-care concerns."), *aff'd*, 951 F.2d 351 (6th Cir. 1991) (per curiam) (table); *see also Notter*, 89 F.3d at *5. These decisions are unpersuasive because lactation is undeniably a "condition of the mother." Indeed, this condition, left to itself, "can be quite disabling[.]  [W]hen a woman is unable to relieve the buildup of milk in the breasts, [the result may be] breast and back pain, plugged ducts, and breast infection." Nicole Kennedy Orozco, Note, *Pumping at Work: Protection from Lactation Discrimination in the Workplace*, 71 Ohio St. L.J. 1281, 1314 (2010); *see also Currier*, 965 N.E. 2d at 836 ("A nursing mother . . . should express breast milk . . . to maintain milk production and avoid engorgement, blockage of milk ducts, galactoceles (milk retention cysts), mastitis (an infection of the breast caused by the blocked milk ducts), and breast abscesses."). The fact that this "medical condition" is at times a result of a decision made by the mother to breastfeed does not mean that it is not a medical

condition or that it is unrelated to pregnancy. In any event, Allen-Brown's claim is distinguishable from the "condition of the child" cases upon which the District relies because those cases involved mothers who were not physically disabled or prevented from working and who sought to extend their maternity leave in order to breastfeed, whereas Allen-Brown sought an accommodation based on a physical condition that limited her ability to work.[10]

For the foregoing reasons, the District's motion for summary judgment as to Counts I and IV is **DENIED**.

## B. Retaliation Claims

In Counts II and V, Allen-Brown alleges retaliation in violation of Title VII and the D.C. Human Rights Act, respectively.[11] Compl. ¶¶ 43–51, 64–67. Both counts allege that Allen-Brown was placed on patrol duty outside the station in retaliation for her complaints about the condition of the lactation facility at the Second District.[12] *Id.* The District contends that it is entitled to summary judgment as to both retaliation claims. Dkt. 26-1 at 6–9.

---

[10] *Compare Barrash*, 846 F.2d at 929–30; *Fejes*, 960 F. Supp. at 1490; *McNill*, 950 F. Supp. at 567; *Wallace*, 789 F. Supp. at 868, *with* Dkt. 1-9 at 2 (Allen-Brown's request for station assignment because "[w]earing [her] [bullet-proof] vest is extremely painful and could clog [her] ducts and slow down the production of [her] milk supply.") *and* Dkt. 27-4 at 4; Dkt. 28-15 at 3 (District's own doctor agreeing that this was a legitimate medical concern).

[11] In the next section, the Court concludes that Count V also alleges a claim for a direct violation of D.C. Code § 2-1402.82(d)(2), which imposes an affirmative duty on employers to make reasonable efforts to provide a private, secure, and sanitary lactation room. *See infra* pp. 35–39. "Although absence of segregation in the complaint doubtless complicates the court's task, the complication can presumably be cured by insistence on suitably targeted briefing, and is not an independent ground for" treating the allegations as raising only discrete claims. *Baird v. Gotbaum*, 662 F.3d 1246, 1253 (D.C. Cir. 2011). *See also Kelly v. LaHood*, 840 F. Supp. 2d 293, 304 (D.D.C. 2012) ("A complaint need not necessarily use the words 'hostile work environment' in order to make out a hostile-work-environment claim. . . . Indeed, 'discrimination' or 'retaliation' can 'in principle include[] a hostile work environment theory.'" (internal citation omitted) (second alteration in original) (quoting *Steele*, 535 F.3d at 694)).

[12] Although Allen-Brown also raised concerns about the quality of the lactation facility at the Academy and Counts II and V of the complaint could potentially be construed to encompass that

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). The DCHRA similarly prohibits "retaliat[ion] against . . . any person in the exercise or enjoyment of, or on account of having exercised or enjoyed . . . any right granted or protected under this chapter." D.C. Code § 2-1402.61(a). "The elements of a retaliat[ion] claim are the same under [the] DCHRA as under the federal employment discrimination laws." *Beckwith v. Career Blazers Learning Ctr. of Washington, D.C., Inc.*, 946 F. Supp. 1035, 1041 (D.D.C. 1996).

"Evaluation of Title VII retaliation claims [based on circumstantial evidence] follows the same [*McDonnell Douglas*] burden-shifting template as discrimination claims." *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006). "To establish a prima facie case of retaliation, the plaintiff must present evidence that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights."[13] *Id.* at 901–02. As with a discrimination claim, once the defendant puts forth a legitimate, non-discriminatory reason for the adverse action, the question whether the plaintiff has established a prima facie case drops out of the case. *See Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009). At that point, "the only question is the 'ultimate factual issue in the case'—'discrimination *vel non*.'" *Id.* (quoting *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714–15 (1983)). In ruling on a motion for summary

---

objection in addition to her objection to the Second District facility, her brief in opposition to the District's motion for summary judgment is focused solely on her complaints regarding the Second District facility. *See* Dkt. 27-1 at 8.

[13] The standard for what constitutes an "adverse employment action" is lower with respect to a retaliation claim than with respect to a discrimination claim. *See Baird*, 662 F.3d at 1249. This distinction is irrelevant here, since the District concedes for purposes of summary judgment that the denial of limited-duty status was an adverse employment action. *See* Dkt. 26-1 at 6.

judgment, the Court, accordingly, must determine whether there is "sufficient evidence for a reasonable jury to infer retaliation." *Id.* at 679.

The District argues that it is entitled to summary judgment on both of Allen-Brown's retaliation claims because she made her complaints about the condition of the lactation room to her supervisors at the Second District, but "[t]hese supervisors did not make the decision about [Allen-Brown's] participation in the Non POD limited duty program." Dkt. 26-1 at 7. According to the District, "it is undisputed that William Sarvis, the official who made the determination that [Allen-Brown] could not participate in the Non POD limited duty program, did not know about [Allen-Brown's] complaints." *Id.* Allen-Brown responds that the closeness in time between her supervisors' acknowledgement of her complaint about the lactation room at the Second District and the denial of limited-duty status "is sufficient to establish temporal proximity for purposes of retaliation" and that she "is entitled to have Mr. Sarvis' credibility judged by a finder of fact." Dkt. 27-1 at 4.

The Court agrees that the record establishes that there is a genuine dispute of material fact on the retaliation issue. The District is, of course, correct that a reasonable jury could not infer that the denial of limited-duty status to Allen-Brown was based on a retaliatory motive unless the relevant decision makers were aware that she engaged in protected conduct. *See Jones*, 557 F.3d at 679. "To survive summary judgment, however, [Allen-Brown] needn't provide direct evidence that [the decision maker] knew of [her] protected activity; [s]he need only offer circumstantial evidence that could reasonably support an inference that they did." *Id.* One way to meet this burden is to provide evidence of temporal proximity. As the D.C. Circuit has explained, where "'the *employer* had knowledge of the employee's protected activity, and the adverse personnel action took place shortly after that activity,'" that showing is typically

sufficient "'to permit an inference of retaliatory motive.'" *Id.* (quoting *Holcomb*, 433 F.3d at 903) (emphasis in original). In some cases, temporal proximity might prove "insufficient to permit an ultimate inference of retaliation" when considered in "the full context" of the case, but where other evidence "discredit[s]" the employer's asserted reason for taking the adverse action, the court need not decide that issue. *Id.* at 680. Here, both evidence of temporal proximity and evidence of pretext raise a genuine, material dispute of fact for the jury.

To start, Allen-Brown offers compelling temporal proximity evidence. On June 9, 2011, after having made prior oral complaints, she lodged a written complaint about the District's lactation facility. Dkt. 1-7 at 2. This complaint was first acknowledged by a supervisor on June 22, 2011. *Id.*. When Allen-Brown arrived at the station that night for her next shift, she was assigned to outside patrol duty for the first time since her return to work. Dkt. 27-20 at 3 (Pl.'s Dep. 32). As she had previously informed her supervisors, moreover, she was unable to perform this duty because she was lactating and, as a result, could not wear the required bullet-proof vest. *Id.*; Dkt. 1-9 at 2. Then, even though the doctor who examined Allen-Brown at the MPD's clinic, Dr. Murthy, confirmed that Allen-Brown was unable to wear a vest because she was lactating, Sarvis issued his memorandum denying Allen-Brown limited-duty status the following day, on June 24. Dkt. 1-11 at 2. Drawing all justifiable inferences in Allen-Brown's favor, *see Liberty Lobby*, 477 U.S. at 255, a reasonable jury could infer from this rapid sequence of events that Allen-Brown's complaints about the lactation room caused the District's decision to move her from station duty, which accommodated her pregnancy-related medical condition, to patrol duty, which did not.

Nor is the Court persuaded by the District's contention that there is no evidence in the record that would permit a reasonable jury to question Sarvis's statement that he did not know

about Allen-Brown's complaint when he denied her limited-duty status. *See* Dkt. 29 at 1. First, Sarvis initially stated in his deposition that he did not remember the circumstances surrounding how he learned of the issue of Allen-Brown's limited-duty status. Dkt. 27-6 at 2 (Sarvis Dep. 45). Only later did he declare that he learned of the matter from the Police and Fire Clinic and that he did not know about Allen-Brown's complaints about the designated lactation area when he declined to grant her limited-duty status. Dkt. 26-5 at 3 (Sarvis Decl. ¶ 19). Second, the record reflects that Sarvis had contact with at least one person who likely knew of Allen-Brown's complaint at the time that he denied her limited-duty status. Antonio Charland delivered Sarvis's memorandum from Sarvis to Allen-Brown, Dkt. 1-11 at 2, and Charland (as well as others) had been copied on the email responding to Allen-Brown's complaint about the lactation room, Dkt. 1-7 at 2. Third, as the Court explained with respect to Allen-Brown's discrimination claim, there are disputed questions of material fact surrounding the explanation of the denial of limited-duty status given by Sarvis. *See supra* pp. 19–21. To the extent that a jury might doubt that explanation, it might more generally question the credibility of Sarvis's testimony. *See Liberty Lobby*, 477 U.S. at 255. In addition, as explained above, there is some conflicting evidence about whether Sarvis was, in fact, the ultimate decision maker. *See supra* p. 21. Thus, the District's contention that there is no genuine dispute of material fact about whether the decision maker was aware of Allen-Brown's complaint is unavailing. There are material questions of disputed fact regarding (1) who made the decision to deny Allen-Brown limited-duty status, (2) what that person or persons knew or did not know at the time, and (3) the basis for the decision.

Finally, the District argues that it is entitled to summary judgment on Count II—the Title VII retaliation claim—for the further reason that Allen-Brown did not engage in relevant

protected conduct when she complained about the condition of the lactation room. Dkt. 26-1 at 8–9. According to the District, Allen-Brown's complaint about the lactation room did "not challenge a practice that violates Title VII . . . because her complaints do not show women were treated less favorably than men." *Id.* at 8. Allen-Brown, in turn, argues that her complaint implicated "the Pregnancy Discrimination Act's prohibitions, the requirements of the Fair Labor Standards Act [FLSA], and the District of Columbia Human Rights Act [DCHRA]." Dkt. 27-1 at 10.

Neither party poses the correct question. "To recover under the opposition clause [of Title VII], the plaintiff must have been discriminated against for opposing a practice 'made an unlawful employment practice *by*" *Title VII*. *King v. Jackson*, 487 F.3d 970, 972 (D.C. Cir. 2007) (emphasis added). Accordingly, Allen-Brown's contention that the condition of the lactation room violated the *FLSA* or the *DCHRA* is insufficient to show that she is entitled to relief. But the District is also wrong to suggest that Allen-Brown must show that her complaints challenged an *actual* violation of Title VII. The relevant question, instead, is whether Allen-Brown's complaints were "based on [a] reasonable belief" that her rights under Title VII were violated. *Parker v. Baltimore & O. R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981).

There is little guidance in the case law on what this means, and the parties have not briefed the issue. The case law does establish that "[a]n employer has . . . no legitimate interest in retaliating against an employee for opposition *per se*" and that the "reasonable belief" requirement protects employers "against malicious accusations and frivolous claims." *Id.* But, beyond that, the case law does not explain how the reasonableness inquiry operates. Would it be enough, for example, for Allen-Brown to have *subjectively* believed that she had a legal right to a suitable place to express milk, without reference to any particular law, as long as an *objectively*

reasonable argument could be made that Title VII law "was in an 'unsettled state'" on the issue? *King*, 487 F.3d at 973; *cf. Parker*, 652 F.2d at 1020 ("[A] layperson should not be burdened with the 'sometimes impossible task' of correctly anticipating how a given court will interpret a particular statute.").

Because neither party has addressed whether Allen-Brown's complaints were based on a "reasonable" belief that the MPD's actions violated Title VII, the Court cannot evaluate the merits of the District's defense. Indeed, on the present record, it is not even clear precisely what Allen-Brown said in her various complaints. The parties, for example, have provided a copy of an email that she sent to Lieutenant Wheeler-Moore, which complained about only the cleanliness of the room, Dkt. 1-7 at 2, but other evidence suggests that Allen-Brown also complained orally about a lack of privacy, Dkt. 28-12 at 7–8 (Pl.'s Dep. 29–30) ("Officers went there to take rest breaks or to take naps . . . during their breaks if they were tired."). But, to prevail at summary judgment, the District must establish that there is no genuine dispute of material fact *and* that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The present record is disputed and incomplete, and the parties have not addressed the factual and legal questions surrounding whether Allen-Brown "reasonably" believed that her complaints implicated Title VII. The Court must, accordingly, deny the District's motion for summary judgment on both of Allen-Brown's retaliation claims. If warranted, however, the District may promptly renew its motion with respect to the Title VII claim, addressing the issues discussed above. Given the overlap between Allen-Brown's Title VII and DCHRA retaliation claims, however, and the District's failure to raise a similar defense with respect to Allen-Brown's

DCHRA retaliation claim,[14] any further briefing on this issue need not and should not delay final preparation for trial in this matter.

The District's motion for summary judgment as to Counts II and V is, accordingly, **DENIED**.

### C.    **D.C. Code § 2-1402.82(d)(2) Claim**

Allen-Brown cross-moves for partial summary judgment with respect to Count V. Dkt. 28. In that count, she alleges that the District violated D.C. Code § 2-1402.82(d)(2) by failing to provide "priva[te], secur[e] or sanitary locations for breastfeeding mothers to express milk. Compl. ¶ 66. Section 2-1402.82 was enacted as part of the Child's Right to Nurse Human Rights Amendment Act of 2007, which amended the DCHRA. 2007 District of Columbia Laws 17-58 (Act 17–132). As relevant here, the Right to Nurse Act provides that:

> An employer shall make reasonable efforts to provide a sanitary room or other location in close proximity to the work area, other than a bathroom or toilet stall, where an employee can express her breast milk in privacy and security. The location may include a childcare facility in close proximity to the employee's work location.

D.C. Code § 2-1402.82(d)(2). The statute defines "reasonable efforts" as "any effort that would not impose an undue hardship on the operation of an employer's business" and defines "undue hardship" as "any action that requires significant difficulty or expense when considered in relation to factors such as the size of the business, its financial resources, and the nature and structure of its operation." *Id.* § 2-1402.82(a).

---

[14] The District presumably declined to make this argument with respect to Allen-Brown's DCHRA retaliation claim because the DCHRA—unlike Title VII—places an affirmative duty on an employer to make reasonable efforts to accommodate a lactating mother without regard to whether it provides accommodations to other similarly situated employees. *See* D.C. Code § 2-1402.82(d)(2). Accordingly, regardless of whether Allen-Brown can proceed on her Title VII retaliation claim, she can proceed on her parallel DCHRA retaliation claim.

In January 2011, the MPD promulgated a "Lactating Accommodation Policy" to implement the requirements of the Right to Nurse Act. Dkt. 28-7. That policy provided, among other things, that "[r]estrooms shall not be designated as appropriate spaces for lactation purposes." *Id.* at 4. In March and June 2011, the District conducted inspections of its police stations to determine whether they were in compliance with the policy. Dkt. 28-9 at 2; Dkt. 28-10 at 3. As relevant here, the inspections found that the lactation room for the Second District was, at the relevant time, located in the lounge area of a restroom.[15] *Id.* During discovery, moreover, the District conceded that "the areas designated as lactation rooms in more than one district or element are, in fact, in the ladies restroom, in violation of" the Lactating Accommodation Policy. Dkt. 28-8 at 3. Subsequently, however, it refined its position, arguing that "[t]he lactation room [at the Second District] was in a lounge area inside the restroom[.] *[I]t was not the restroom* or a stall in the restroom." Dkt. 29-1 at 3 (Def.'s Statement of Disputed Facts ¶ 14) (emphasis added).

Against this backdrop, Allen-Brown argues that she is entitled to summary judgment because it is undisputed that the Second District lactation facility was located inside a restroom.[16] Dkt. 28-1 at 3–5. That contention, however, ignores the plain language of D.C. Code § 2-1402.82(d)(2), which does not impose a categorical prohibition on the use of bathrooms as lactation facilities, but rather mandates that "[a]n employer . . . make *reasonable*

---

[15] Sarvis testified that in 2015, modifications to the Second District's women's restroom were made so that the lactation room would be a separate, private room. Dkt. 28-11 at 3 (Sarvis. Dep. 107).

[16] Although Allen-Brown's complaint refers to other instances in which the District purportedly failed to provide an adequate lactation room (including the use of paper to cover a window, presumably at the Academy), Compl. ¶ 18, her motion for summary judgment focuses exclusively on the lactation facility at the Second District, *see generally* Dkt. 28-1.

*efforts* to provide a sanitary room or other location in close proximity to the work area other than a bathroom or toilet stall, where an employee can express her breast milk in privacy and security." (Emphasis added). The "reasonableness" of the employer's efforts to provide an appropriate place to express milk turns on the "difficulty or expense" of providing such a location, *id*. § 2-1402.82(a)—a question necessarily bound up with the issue whether it was proper for the Second District to designate the lounge area of a bathroom as the lactation room. The present record says nothing about the expense of making changes, the financial resources of the MPD, the availability of other space, or the proximity of that space to Allen-Brown's work area. Nor does it include a detailed description of how the "lounge area" was situated within the restroom area. Because Allen-Brown has therefore failed to show a lack of any genuine dispute regarding the "reasonableness" of the District's actions, she has failed to carry her burden on summary judgment. *See* Fed. R. Civ. P. 56(a).

Given this conclusion, the Court need not dwell on the District's arguments that there is no private cause of action for accommodation-related violations of the Right to Nurse Act and that, in any event, Allen-Brown cannot recover any damages for the alleged violation of the Act because she failed administratively to exhaust her claims for unliquidated damages in accordance with D.C. Code § 12-309. *See* Dkt. 30 at 3–5. The District has not cross-moved for summary judgment on these grounds, and neither argument raises a jurisdictional issue that this Court must address *sua sponte*. But, in any event, the first contention is insubstantial, because the DCHRA does, indeed, provide a private cause of action for "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice," including by violations of the Right to Nurse Act. D.C. Code § 2-1403.16(a); *see also id*. § 2-1402.82(b) ("It shall be an unlawful discriminatory practice to deny a woman any right provided under this section."). As for the second contention, at an

earlier stage in this litigation, the District withdrew a similar non-exhaustion argument on the ground that "the requirement that District employees must first bring their [DCHRA and Right to Nurse Act] claims to the Office of Human Rights has been eliminated from the statute." Dkt. 13 at 5; *see also* D.C. Code § 2-1403.16(c).   Although the District may have reconsidered that concession, neither it nor Allen-Brown has briefed the question whether the amendment to the statute is applicable to this case. *Cf. Bowyer v. District of Columbia*, 779 F. Supp. 2d 159, 165 (D.D.C. 2011) (holding that "the elimination of the pre-suit notice provision [of D.C. Code § 12-309 for whistleblower claims] . . . is a procedural change, which must therefore be applied to pending actions and claims").

This, then, leaves only one final contention by the District as to Count V.  In its opposition to Allen-Brown's motion for summary judgment, it asserts that "[t]he Court should not allow Plaintiff to broaden her claims to include a claim of direct violation of D.C. Code § 2-1402(d)(2) when her Complaint pled only retaliation." Dkt. 30 at 3.  The Court has already rejected the District's motion for summary judgment on Allen-Brown's retaliation claims.  *See supra* pp. 28–35.  But, in any event, the District is wrong that Count V does not allege a "direct violation" of the Right to Nurse Act.  In unmistakable terms, Count V cites to § 2-1402.82(d)(2) and avers that "MPD did not provide privacy, security or sanitary locations for breastfeeding mothers to express milk."  Compl. ¶¶ 65–66.  Indeed, the District acknowledges as much.  Dkt. 30 at 3 ("Plaintiff argues that . . . 'the lactation facility at the work where she was assigned did not meet' [the] requirements [of § 2-1402.82(d)(2)].").  Allen-Brown's complaint was clearly "'sufficient to put defendant[] on notice of [the] theor[ies] of recovery upon which [she] is relying.'"  *Kelly*, 840 F. Supp. 2d at 304 (quoting *Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1297 (D.C. Cir. 2010)).  The District's attempt to recast Count V as solely a

retaliation claim therefore fails. *See also* pp. 28 n.11 (explaining that although segregation of the complaint is preferable, a count may encompass more than one claim).

The Court, accordingly, **DENIES** Allen-Brown's motion for partial summary judgment on Count V.

### III.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant's motion for summary judgment, Dkt. 26, is **DENIED.** It is further **ORDERED** that Plaintiff's motion for partial summary judgment, Dkt. 28, is **DENIED.**

The parties shall appear for a status conference on April 12, 2016 at 11 a.m. in Courtroom 21.  In advance of that status conference, on or before April 11, 2016, the parties shall confer and shall jointly file a proposed schedule to govern further proceedings in this case.

**SO ORDERED.**


                                            /s/ Randolph D. Moss
                                            RANDOLPH D. MOSS
                                            United States District Judge

March 31, 2016